## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLES PICARELLA,** | : | **CIVIL ACTION NO. 1:20-CV-1440** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN WETZEL**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

### MEMORANDUM

Plaintiff Charles Picarella ("Picarella"), a state inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), commenced this action pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution, and under 61 Pa.C.S. § 5901. (Doc. 1). The matter is proceeding via a third amended complaint. (Doc. 50). Named as defendants are John Wetzel, Robert Marsh, Dorina Varner, Keri Moore, J. Burd, Bernadette Mason, Robert Williamson, Theresa DelBalso, B. Ralston, and thirteen John Doe individuals. Before the court is a Rule 12(b) motion (Doc. 52) to dismiss filed by defendants Wetzel, Marsh, Varner, Moore, Burd,[1] Mason, and Williamson. For the reasons set forth below, the motion will be granted in part and denied in part.

---

[1] Picarella seeks to voluntarily withdraw all claims against J. Burd. (See Doc. 63 at 11). We will dismiss the claims against defendant J. Burd pursuant to Federal Rule of Civil Procedure 41(a)(2).

## I.    <u>Factual Background & Procedural History</u>[2]

Defendant Wetzel is the Secretary of the Department of Corrections and "has the authority and obligation to propose, implement, and enforce policies, procedures, and practices to ensure that the Department operated and operates in a manner that protects the rights of prisoners." (Doc. 50 ¶¶ 4-5).

Defendant Marsh was the Superintendent of the State Correctional Institution at Benner Township ("SCI-Benner"), Bellefonte, Pennsylvania, at all relevant times. (<u>Id.</u> ¶ 6). Picarella contends that defendant Marsh "had the authority and obligation to propose, implement, and enforce policies, procedures, and practices to ensure that SCI Benner Twp. operated in a manner that protected the rights of prisoners." (<u>Id.</u> ¶ 7).

Defendants Varner and Moore are Chief Grievance Officers for the DOC, they review grievance appeals on final review, and "had the authority and obligation to ensure that the Department's administrative grievance process operated and operates in a manner that protected and protects the rights of prisoners." (<u>Id.</u> ¶¶ 8-13).

Defendant Mason is the Superintendent of the State Correctional Institution at Mahanoy ("SCI-Mahanoy"), Frackville, Pennsylvania. (<u>Id.</u> ¶ 24). Picarella

---

[2] For purposes of this memorandum, we only include the factual allegations against defendants Wetzel, Marsh, Varner, Moore, Mason, and Williamson.

contends that defendant Mason "has the authority and obligation to propose, implement, and enforce policies, procedures, and practices to ensure that SCI Mahanoy operated and operates in a manner that protects the rights of prisoners." (Id. ¶¶ 24-25).

Defendant Williamson was a Corrections Lieutenant at SCI-Benner in June of 2019.  (Id. ¶ 26).  In this capacity, defendant Williamson allegedly had the authority to investigate and dispose of administrative grievances filed by inmates. (Id. ¶ 27).

Picarella was housed in general population at SCI-Benner from August 29, 2018 through January 16, 2020.  (Id. ¶¶ 35-36).  Picarella alleges that he was denied two hours of daily outdoor exercise at SCI-Benner from August 29, 2018 through September 18, 2018, on October 31, 2018, November 1, 2018, March 9, 2019, May 21, 2019, August 19 and 20, 2019, November 12, 2019, and from December 27, 2019 through January 2, 2020.  (Id. ¶¶ 37-44).  He further alleges that he was denied two hours of daily outdoor exercise at SCI-Mahanoy from January 28, 2020 through January 30, 2020, and from March 23, 2020 through the filing of the third amended complaint.  (Id. ¶¶ 49-50, 64-68).  Picarella asserts that these denials were not due to inclement weather.  (Id. ¶¶ 45, 51).

On November 6, 2018, Picarella received notice from the DOC that he would not be permitted to receive his *Rolling Stone* magazine because it contained obscene

material, sexually explicit material, and nudity.  (Id. ¶¶ 77-81; Doc. 50 at 25).

Picarella contends that the magazine did not contain obscenity, sexually explicit

material, or nudity as defined by the Pennsylvania regulations.  (Doc. 50 ¶¶ 82-84).

He alleges that the decision to deny him the *Rolling Stone* magazine was not related

to any legitimate penological objective.  (Id. ¶ 88).  On February 21, 2019, Picarella

received notice from the DOC that he would not be permitted to receive a chemistry

textbook he ordered because it contained information on "[d]etermining the

formula of a compound."  (Id. ¶¶ 106-07; Doc. 50 at 31).  Picarella asserts that the

decision to deny him the chemistry textbook was not related to any legitimate

penological objective because it did not contain any prohibited information.  (Doc.

50 ¶¶ 109-111, 240).  Defendants Varner, Moore, and Marsh allegedly denied

Picarella's grievances related to the *Rolling Stone* magazine and chemistry textbook.

(Id. ¶¶ 91-104, 113-125).

In April and May of 2019, prison staff denied Picarella incoming, non-

privileged correspondences from opposing counsel Christine Munion, Esquire,

without providing notice of the denial.  (Id. ¶ 130-145).  Picarella alleges that the

denial violated his First Amendment right to freedom of speech and freedom of

association.  (Id. ¶ 241).  Defendants Marsh and Moore allegedly denied Picarella's

grievances related to the correspondence from Attorney Munion.  (Id. ¶¶ 149-157).

On or about April 13, 2020, Picarella was denied incoming correspondence from the Attorney General containing information that debunked Sovereign Citizenship theories.  (Id. ¶¶ 178-80).  It was determined that the correspondence was unacceptable pursuant to Department policy DC-ADM 803(1)(c)(11), Inmate Mail and Incoming Publications.  (Id. ¶¶ 181, 184; Doc. 50 at 33-34).  Picarella alleges that he did not receive adequate notice of the reason for the confiscation because the unacceptable correspondence form did not provide a reason for the confiscation.  (Doc. 50 ¶¶ 182-85; Doc. 50 at 37).

On or about May 13, 2020, Picarella was denied incoming correspondence from the Lewis and Clark Law Review containing information that debunked Sovereign Citizenship theories.  (Doc. 50 ¶¶ 189-91).  The correspondence was determined to be unacceptable pursuant to Department policy DC-ADM 803(1)(c)(11).  (Id. ¶ 192).  The unacceptable correspondence form from the mailroom informed Picarella that the incoming mail sent to him from the Law Review was confiscated because it contained materials related to the Uniform Commercial Code ("UCC"), Sovereign Citizens, and the Redemptive Process.  (Doc. 50 at 39).

On May 21, 2019, the DOC implemented a Violence Reduction Strategy ("VRS") to reduce violence within state prisons.  (Doc. 50 ¶¶ 196, 199).  The strategy includes proactive planning and response strategies to prohibited violent acts that

involve staff assaults, inmate fights/assaults with weapons, multiple inmate fights/assaults, and fights/assaults with serious bodily injury.  (Doc. 50 at 41).  The VRS authorizes the following sanctions and privilege restrictions: housing unit lockdown for thirty-six hours, reduction of visits and phone calls, and revocation of commissary, yard, and activity privileges.  (Doc. 50 ¶¶ 199-202; Doc. 50 at 41).  Picarella alleges that defendant Marsh implemented the VRS at SCI-Benner upon the directive of defendant Wetzel.  (Doc. ¶¶ 197-198).  He alleges that the policy violates the constitutional rights of inmates, deprives inmates of exercise in violation of 61 Pa.C.S. § 5901, and lacks any legitimate penological objective.  (Id. ¶¶ 203-208).

On May 21, 2019, Picarella submitted an order to the SCI-Benner commissary for pipe tobacco, with a total price of $9.97.  (Id. ¶¶ 208-209).  He alleges that $9.97 was deducted from his inmate account, but he never received the tobacco or a refund to his inmate account.  (Id. ¶¶ 210-214).  He contends that the Department "retained the funds."  (Id. ¶ 215).  Picarella claims that defendants Williamson, Marsh, and Varner denied his grievances concerning the deduction of money from his account, thereby unlawfully converting and taking his property.  (Id. ¶¶ 217-236).

Picarella availed himself of the administrative review process by filing grievances related to all claims in this action.  (Id. ¶ 238).

Defendants move to dismiss the third amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 52).  The motion is fully briefed and ripe for resolution.

## II.   **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)).  Although the court is generally limited in its review to the facts contained in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

Federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint in the

face of a Rule 12(b)(6) motion, the court must conduct a three-step inquiry.  See

Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step,

"the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"

Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal

elements of a claim should be separated; well-pleaded facts must be accepted as

true, while mere legal conclusions may be disregarded.  Id.; see also Fowler v.

UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the well-pleaded factual

allegations have been isolated, the court must determine whether they are sufficient

to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550

U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient

to "raise a right to relief above the speculative level").  A claim "has facial

plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."

Iqbal, 556 U.S. at 678.

**III.    Discussion**

    **A.    Official Capacity Claims**

Defendants first argue that Picarella's claims against them in their official

capacities are barred by sovereign immunity.  (Doc. 56 at 12-13).  Personal capacity

suits under section 1983 seek to recover money from a government official, as an

individual, for acts performed under color of state law.  Gregory v. Chehi, 843 F.2d

111, 120 (3d Cir. 1988).  Official capacity suits, in contrast, generally represent an action against an entity of which the government official is an agent.  Id.; see also Monell v. Dep't of Social Servs., 436 U.S. 658, 690 n. 55 (1978).  When suits are brought against state officials in their official capacities, those lawsuits are treated as suits against the state.  Hafer v. Melo, 502 U.S. 21, 25 (1991).  However, the doctrine of sovereign immunity, established by the Eleventh Amendment, protects states, such as the Commonwealth of Pennsylvania, from suits by citizens. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-01, 117 (1984); Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996); Lavia v. Pennsylvania, 224 F.3d 190, 195-96 (3d Cir. 2000).  That immunity runs to state officials if they are sued in their official capacity and the state is the real party upon which liability is sought. Scheuer v. Rhodes, 416 U.S. 232, 237-38 (1974).  Congress has not abrogated the immunity regarding Picarella's claims, nor has Pennsylvania waived this grant of immunity.  See 42 PA. C.S.A. § 8521(b).  Thus, Picarella's section 1983 claim against the defendants in their official capacities is barred by sovereign immunity and will be dismissed.  See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 254 (3d Cir. 2010).

**B.   Claims against Defendants Wetzel, Marsh, Mason, Moore, Varner, and Williamson**

Individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated

9

solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207-08; see also Rizzo v. Goode, 423 U.S. 362 (1976); Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003). Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible. Evancho, 423 F.3d at 354; Rode, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. Rode, 845 F.2d at 1208. A claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. Id. at 1207.

Supervisors "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 556 U.S. at 676. With respect to supervisory liability, there are two theories: "one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to

violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." Santiago v. Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010 (quotation and alteration marks omitted).  With respect to the first theory, "the plaintiff must establish that: (1) existing policy or practice creates an unreasonable risk of constitutional injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." Merring v. City of Carbondale, 558 F. Supp. 2d 540, 547 (M.D. Pa. 2008) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).  As to the second theory, a plaintiff must show that each defendant personally participated in the alleged constitutional violation or approved of it.  See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); see also Iqbal, 556 U.S. at 677.

In the third amended complaint, Picarella asserts that defendant Wetzel is the Secretary of the Department of Corrections and "has the authority and obligation to propose, implement, and enforce policies, procedures, and practices to ensure that the Department operated in a manner that protected the rights of prisoners." (Doc. 50 ¶¶ 4-5).  He avers that defendant Marsh, in his role as Superintendent of the SCI-Benner, "had the authority and obligation to propose, implement, and enforce policies, procedures, and practices to ensure that SCI Benner Twp. operated in a manner that protected the rights of prisoners." (Id. ¶¶ 6-

7).  He also asserts that defendant Mason is the SCI-Mahanoy and "has the authority and obligation to propose, implement, and enforce policies, procedures, and practices to ensure that SCI Mahanoy operated and operates in a manner that protects the rights of prisoners."  (Id. ¶¶ 24-25).  Construing the third amended complaint liberally, these allegations are sufficient to establish the personal involvement of defendants Wetzel, Marsh, and Mason.  The court will deny defendants' motion to dismiss on the basis that defendants Wetzel, Marsh, and Mason lacked personal involvement in the alleged wrongs.

Next, Picarella attempts to hold defendants Marsh, Mason, Moore, Varner, and Williamson liable based on their involvement in the grievance procedure.  (Id. ¶¶ 27, 217-36).  This claim fails.  Picarella avers that defendants Varner and Moore are Chief Grievance Officers for the DOC and review grievance appeals on final review.  (Id. ¶¶ 8-13).  He alleges that defendant Williamson had the authority to investigate and dispose of administrative grievances filed by inmates.  (Id. ¶ 27).  At their respective levels of review, Picarella alleges that defendants Marsh, Mason, Varner, Moore, and Williamson each denied his administrative grievances.  (Id. ¶¶ 91-104, 113-125, 217-36).  Courts have routinely held that the "failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation."  Flanagan v. Shively, 783 F. Supp. 922, 931-32 (M.D. Pa. 1992), aff'd, 980 F.2d 722 (3d Cir. 1992).  Dissatisfaction with responses to an

12

inmate's grievances does not support a constitutional claim.  See <u>Alexander v. Gennarini</u>, 144 F. App'x 924 (3d Cir. 2005) (concluding that involvement in the post-incident grievance process is not a basis for § 1983 liability).[3]  Picarella cannot maintain a claim against defendants Marsh, Mason, Moore, Varner, and Williamson based on their respective roles in the grievance process, and these claims will be dismissed.

### C.   Claim under 61 Pa.C.S. § 5901

Picarella alleges that defendants denied his right to exercise under 61 Pa.C.S. § 5901.  (Doc. 50 ¶¶ 32-76, 239).  Section 5901 of the Prisons and Parole Code, 61 Pa.C.S. § 5901, requires the Department of Corrections to provide inmates with two hours of daily physical exercise.  Section 5901 provides as follows:

> (1) A chief administrator who may or shall have in charge any inmate, whether the inmate has been tried or not, shall provide the inmate with at least two hours of daily physical exercise in the open, weather permitting, and, upon such days on which the weather is inclement, with two hours of daily physical exercise inside of the correctional institution.

> (2) The physical exercise must be safe and practical, and the judges of several courts are to be the judges thereof.

> (3) Inmates in segregation or disciplinary status shall receive a minimum of at least one hour of daily exercise five days per week.

---

[3]  The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  Citations to nonprecedential decisions reflect that the court has carefully considered and is persuaded by the panel's *ratio decidendi*.

61 Pa.C.S. § 5901.  Picarella alleges that defendants have not complied with Section
5901, which, in turn, violates his constitutional right to due process.  (Doc. 50 ¶ 239).
Section 5901 of the Prisons Code is a Pennsylvania state statute that does not create
federal civil liability.  "To state a claim for relief in an action brought under § 1983,
[plaintiffs] must establish that they were deprived of *a right secured by the
Constitution or laws of the United States*, and that the alleged deprivation was
committed under color of state law."  American Mfrs. Mut. Ins. Co. v. Sullivan, 526
U.S. 40, 49-50 (1999) (emphasis added).  Picarella's reliance on a Pennsylvania
statute—61 Pa.C.S. § 5901—is misplaced and defendants' motion will be granted
with respect this claim.

> **D.      Challenge to the Violence Reduction Strategy**

Defendants next argue that Picarella lacks standing to bring a challenge to
the Violence Reduction Strategy.  (Doc. 56 at 18-20).  To establish Article III
standing, a plaintiff must suffer an injury that is "concrete, particularized, and
actual or imminent; fairly traceable to the challenged action; and redressable by a
favorable ruling."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting
Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)).  The Supreme
Court has been clear that an injury, to be cognizable, must not be "too speculative."
Clapper, 568 U.S. at 409.  Rather, the injury must be "*certainly* impending."  Id.
(quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 565 n.2, (1992)) (emphasis in

original). "[A]llegations of *possible* future injury" are not sufficient.  Id. (quoting

Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) (emphasis in original).

Picarella alleges that the Violence Reduction Strategy violates his

constitutional rights and that he was last subjected to the sanctions of the VRS on

October 21, 2021 and October 22, 2021.  (Doc. 50 ¶¶ 196-208; Doc. 63 at 17).  The third

amended complaint alleges three types of injures: denial of the opportunity to

exercise, loss of property, and disparate treatment.  (Doc. 50 ¶¶ 205-207; Doc. 63 at

17).  Picarella contends that these injuries are, in part, a result of the sanctions

imposed under the Violence Reduction Strategy.  He asserts that these injuries

would be redressable by a favorable ruling of this court.  (Doc. 63 at 18).  We

conclude that these allegations are sufficient to confer standing.  Defendants'

motion to dismiss Picarella's challenge to the Violence Reduction Strategy based on

lack of standing will be denied.

### E.    First Amendment Claim

Picarella alleges that publications and correspondences were improperly

denied by the Incoming Publications Review Committee ("IPRC").  These items

include: (1) a *Rolling Stone* magazine; (2) a chemistry textbook; (3) non-privileged

mail from Attorney Christine Munion; and (4) non-privileged correspondences from

the Office of Attorney General of Washington State and the Lewis and Clark Law

Review.  (Doc. 50 ¶¶ 77-158; 178-195, 240-243).  Picarella claims that the denials of

these items were in violation of DC-ADM 803 and the confiscation of these items violated his First Amendment rights to freedom of speech and freedom of association.

Inmates have a liberty interest in their mail under the First and Fourteenth Amendments and their ability to send and receive mail may be restricted only for legitimate penological interests.  See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).  A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation.  See Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir. 1995), abrogated on other grounds by Lewis v. Casey, 518 U.S. 343 (1996).  In Turner, the United States Supreme Court found that a prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest.  Turner, 428 U.S. at 89.  The Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without

impinging constitutional rights. Id. at 89-91. The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security. Id.

### 1. *Rolling Stone Magazine*

Inmates have no right to receive materials that constitute obscenity. Miller v. California, 413 U.S. 15, 23 (1973) ("[O]bscene material is unprotected under the First Amendment."). However, materials that constitute indecent sexual expression not rising to the level of obscenity are constitutionally protected. Reno v. American Civil Liberties Union, 521 U.S. 844, 874-75 (1997); see also Ramirez v. Pugh, 379 F.3d 122, 129 n.2 (3d Cir. 2004) (explaining same). DC-ADM 803 provides that "correspondence, publications and/or photographs containing explicit sexual material, (other than in narrative form) and/or nudity as defined in the Glossary Terms, are prohibited from entering a facility or being possessed within a facility. Obscene material is illegal and will not be permitted under any circumstances." (Doc. 50 at 28) (DC-ADM 803, Inmate Mail and Incoming Publications Procedure Manual, Section 3(c)(1)–Publications). An exception to the denial of explicit sexual material and/or nudity exists "if the material has artistic, educational, or medical value" as opposed to material that "regularly features sexually explicit content intended to raise levels of sexual arousal or to provide sexual gratification." (Id., DC-ADM 803, Section 3(c)(2)).

17

As relevant here, Picarella received notice from the DOC that he would not be permitted to receive his *Rolling Stone* magazine because it contained obscene, sexually explicit material, and nudity.  (Doc. 50 ¶¶ 77-81; Doc. 50 at 25).  Picarella alleges that the magazine did not contain obscenity, sexually explicit material, or nudity, and the decision to deny him the *Rolling Stone* magazine was not related to any legitimate penological objective.  (Id. ¶¶ 82-84, 88).  This issue requires a factual determination that cannot be made on a motion to dismiss.  Accordingly, defendants' motion to dismiss as to the *Rolling Stone* magazine will be denied.

### 2.   *Chemistry Textbook*

While housed at SCI-Benner, Picarella ordered a chemistry textbook— *Chemistry: The Study of Matter*.  (Doc. 50 ¶ 106).  The textbook was evidently flagged by the mailroom and referred to the IPRC.  (Id. ¶¶ 106-107).  The IPRC denied Picarella permission to possess the textbook, observing that the textbook contained information on "[d]etermining the formula of a compound" and therefore ran afoul of DC-ADM 803. (Doc. 50 ¶¶ 106-07; Doc. 50 at 31).  Picarella asserts that the decision to deny him the chemistry textbook was not related to any legitimate penological objective because it did not contain any prohibited information.  (Doc. 50 ¶¶ 109-111, 240).  This inquiry requires a factual determination as to whether the textbook contained prohibited information in violation of DOC Policy.  Such a factual

analysis is inappropriate on a motion to dismiss, and defendants' motion will be denied as to this claim.

### 3. *Correspondence from Attorney Munion*

Defendants have construed Picarella's third amended complaint as asserting a First Amendment claim with respect to incoming correspondence from Attorney Christine Munion. (Doc. 64 at 23-24). However, Picarella "stipulates that there is no First Amendment claim in regards to the incoming correspondences from Christine Munion." (Doc. 63 at 19). This claim will be dismissed.

### 4. *Correspondence from the Attorney General and Law Review*

Picarella was denied correspondence from the Attorney General because it was in violation of DC-ADM 803(1)(c)(11). (Id. ¶ 184; Doc. 50 at 37). Similarly, the correspondence to Picarella from the Law Review was confiscated because it contained UCC, Sovereign Citizen, and Redemptive Process related materials, in violation of DC-ADM 803(1)(c)(11). (Doc. 50 at 39).

Picarella concedes that DC-ADM 803(1)(c)(11) prohibits the materials he sought from the Attorney General and the Law Review. (Doc. 50 ¶ 177). To the extent that Picarella challenges the constitutionality of the DOC's mail policy set forth at DC-ADM 803, it has consistently been held that the policy does not violate an inmate's constitutional rights. In Fontroy v. Beard, 559 F.3d 173 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit held that because the

policy set forth in DC-ADM 803 was "reasonably related to legitimate penological interest.' <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), it passes constitutional muster." <u>Fontroy</u>, 559 F.3d at 174.  Moreover, with respect to correspondence containing UCC materials, the Third Circuit addressed this precise issue and held that the confiscation of an inmate's legal materials concerning UCC filings did not state a viable First Amendment claim.  <u>See</u> <u>Monroe v. Beard</u>, 536 F.3d 198, 206 (3d Cir. 2008); <u>see</u> <u>also</u> <u>Bundy v. Beard</u>, 924 A.2d 723, 2007 WL 1468726 (Pa. Cmwlth. Ct. May 22, 2007) (upholding the validity of the amendment to DC-ADM 803 that prohibited UCC related material).  Further, the Third Circuit has found that a Pennsylvania state prison could sanction an inmate for the possession of UCC related materials.  <u>See</u> <u>Edmonds v. Sobina</u>, 296 F. App'x 214 (3d Cir. 2008).  Because the provisions of DC-ADM 803 do not violate an inmate's constitutional rights, Picarella has failed to state a claim upon which relief can be granted.  Moreover, as set forth in DC-ADM 803, staff at SCI-Mahanoy has a legitimate interest in the safety of its facility and must determine if any items coming through the mail pose a threat to the safety of the staff or other inmates.  (<u>See, e.g.,</u> Doc. 50 at 27-29, DC-ADM 803; <u>see</u> <u>also</u> <u>Guyer v. Beard</u>, 907 F.2d 1424, 1428 (3d Cir. 1990) ("Preventing the introduction of contraband into the prison is unquestionably a legitimate penological interest.")).  The court must defer to the prison officials when it comes

to issues of managing a safe and operational prison facility.  Therefore, we will grant defendants' motion to dismiss with respect to this claim.

### F.      Fourteenth Amendment Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.

### 1.      *Procedural Due Process*

Picarella sets forth a procedural due process claim regarding the denial of outdoor exercise, confiscation of incoming publications and correspondence, deprivation of property, and implementation of the Violence Reduction Strategy. (Doc. 50 ¶¶ 32-235).

To the extent that Picarella is challenging the Department of Corrections' process used for screening incoming books and materials, on the ground that the process itself violates the Due Process Clause, we find that this claim fails on its face.  This is because neither negligent nor intentional confiscation of a prisoner's property and its subsequent loss violate an inmate's right to due process if a meaningful post-deprivation remedy is provided.  See Daniels v. Williams, 474 U.S. 327, 328 (1986) (negligent acts of officials causing unintentional loss of property do not violate due process); Hudson v. Palmer, 468 U.S. 517, 533 (1984) (intentional

deprivation of property does not violate due process if meaningful post-deprivation remedy for loss is available); Monroe, 536 F.3d at 210.

The Third Circuit has held that the Pennsylvania DOC's grievance procedure constitutes an adequate post-deprivation remedy.  See Monroe, 536 F.3d at 210; Tillman v. Lebanon Cty. Corr. Facility, 221 F.3d 410, 422 (3d Cir. 2000). Pennsylvania state law also provides an adequate remedy for prison officials' unlawful deprivation of inmate property.  See 42 PA. CONS. STAT. ANN. § 8522(b)(3); see also Shakur v. Coelho, 421 F. App'x 132, 135 (3d Cir. 2011) (noting that the Pennsylvania Tort Claims Act provides adequate remedy for willful destruction of property).  In his third amended complaint, Picarella asserts that he availed himself of his administrative remedies but did not receive the exact relief requested.  (Doc. 50 ¶¶ 52-53, 55, 91-104, 113-125, 238).  Thus, an adequate post-deprivation remedy was available to him.  To the extent Picarella asserts that his grievances were mishandled or wrongfully denied, he has not alleged the denial of a federal right. See Caldwell v. Beard, 324 F. App'x 186, 189 (3d Cir. 2009).  Likewise, if dissatisfied with the responses to his grievances, Picarella has a suitable remedy to pursue under the Pennsylvania Tort Claims Act.  See Hernandez v. Corr. Emergency Response Team, 771 F. App'x 143, 145 (3d Cir. 2019) (noting that "[e]ven if the prison grievance procedures could be considered constitutionally inadequate, Pennsylvania's state tort law would provide an adequate remedy").

Similarly, regarding the alleged denial of exercise and implementation of the Violence Reduction Strategy, Picarella was not denied procedural due process because he grieved his claims through the Department's grievance system. (Doc. 50 ¶¶ 52, 238). Picarella cannot maintain a Fourteenth Amendment due process violation if there exists a meaningful post-deprivation remedy. See Hudson, 468 U.S. at 533. He was afforded an adequate post-deprivation remedy through the DOC's grievance procedure. See Tillman, 221 F.3d at 422; see also Monroe, 536 F.3d at 210. We will grant defendants' motion to dismiss with respect to the Fourteenth Amendment procedural due process claim.

        **2.**    ***Substantive Due Process***

Picarella's substantive due process claim is duplicative of his First and Fifth Amendment claims and is barred by the "more specific provision rule." In adopting the "more-specific-provision-rule" established in County of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998), the Third Circuit noted that "[u]nder this rule, 'if a constitutional claim is covered by a specific constitutional provision . . . , the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' United States v. Lanier, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (clarifying prior holing in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))." Betts v. New Castle Youth Development Center, 621 F.3d 249, 260-61 (3d Cir. 2010). Picarella's First and

Fifth Amendment claims, and Fourteenth Amendment substantive due process

claims, are based on the same conduct.  Because these claims are covered by a

specific constitutional provision—the First and Fifth Amendments—these claims

must be analyzed under the "more specific provision."

### G.      Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that a

state may not "deny to any person within its jurisdiction the equal protection of the

laws," which is essentially a direction that all persons similarly situated should be

treated alike.  U.S. CONST., amend. XIV; City of Cleburne v. Cleburne Living Ctr.,

473 U.S. 432, 439 (1985) (citing Plyer v. Doe, 457 U.S. 202, 216 (1982)).  An equal

protection claim can be brought by a "class of one," a plaintiff alleging that he has

been "intentionally treated differently from others similarly situated and that there

is no rational basis for the difference in treatment."  Vill. of Willowbrook v. Olech,

528 U.S. 562, 564 (2000); Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003); see also

Jean-Pierre v. Bureau of Prisons, 497 F. App'x 164, 168 (3d Cir. 2012).  If a

distinction between persons does not implicate a suspect or quasi-suspect class,

state action will be upheld if it is rationally related to a legitimate state interest.  See

Tillman, 221 F.3d at 423.  Proof of disparate impact alone, however, is not sufficient

to succeed on an equal protection claim; a plaintiff also must prove that the

defendant intended to discriminate.  See Vill. of Arlington Heights v. Metro.

Housing Dev. Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 242, 244-45 (1976).  Thus, discriminatory intent must be a motivating factor in the decision, even though it need not be the sole motivating factor.  See Vill. of Arlington Heights, 429 U.S. at 265-66.  Moreover, to prove a lack of rational basis, a plaintiff must negate every conceivable rational basis for his differential treatment.  See Bd. of Trustees v. Garrett, 531 U.S. 356, 367 (2001); Ramsgate Court Townhome Ass'n v. West Chester Borough, 313 F.3d 157, 160 (3d Cir. 2002).

Prisoners do not constitute a protected class for Fourteenth Amendment purposes.  See Myrie v. Comm'r, N.J. Dep't of Corr., 267 F.3d 251, 263 (3d Cir. 2001).  Furthermore, Picarella has not adequately alleged that he was treated differently from others who were similarly situated.  See Phillips v. Cty. of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008) (to state an equal protection claim on a "class of one" theory, "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment").  To the contrary, Picarella alleges that *all* inmates were subjected to unequal treatment through the Violence Reduction Strategy, and he suggests that program limits certain privileges of *all* inmates.  (Doc. 50 ¶¶ 201-08, 244).  Accordingly, Picarella has not alleged a basis for an equal protection claim.

**H.     Fifth Amendment Takings Clause Claim**

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation."  U.S. CONST., amend. V.[4]  Picarella alleges that the Commissary Clerk deducted $9.97 from his inmate account and did not refund the money when the sought item was out of stock.  (Doc. 50 ¶¶ 208-216, 245).  He alleges that his property was "placed into an account of the Department" and thus was taken for public use.  (Id. ¶¶ 210, 215-16).  However, that allegation appears to be based entirely on speculation.  Thus, the Takings Clause is not implicated here.  See, e.g., Roop v. Ryan, No. CV 12-0270-PHX-RCB, 2012 WL 1068637, at *3 (D. Ariz. Mar. 29, 2012) ("A prisoner property claim only implicates the Fifth Amendment Takings Clause where the prisoner alleges that prison officials took his personal property and converted it for public use without just compensation."); Allen v. Wood, 970 F. Supp. 824, 831 (E.D. Wash. 1997) ("Plaintiff fails to show that property he was authorized to receive was taken for public use.").

---

[4]  The Takings Clause is made applicable to the states through the Fourteenth Amendment.  See Murr v. Wisconsin, 582 U.S. ——, 137 S.Ct. 1933, 1942, 198 L.Ed.2d 497 (2017) (citing Chi., B. & Q. R. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)).  It applies not only to the taking of real property, but also to government efforts to take identified funds of money.  See, e.g., Phillips v. Wash. Legal Found., 524 U.S. 156, 160, 164-65 (1998); Webb's Fabulous Pharms., Inc. v. Beckwith, 449 U.S. 155, 164-65 (1980).

IV.   **Leave to Amend**

When a complaint fails to present a prima facie case of liability, district courts must generally grant leave to amend before dismissing the complaint.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).  Specifically, the Third Circuit Court of Appeals has admonished that when a complaint is subject to dismissal for failure to state a claim, courts should liberally grant leave to amend "unless such an amendment would be inequitable or futile."  Phillips, 515 F.3d at 245 (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).  Picarella has been granted the opportunity to file three amendments to the complaint.  Therefore, the court finds that further amendment would be futile.  See Jones v. Unknown D.O.C. Bus Driver & Transp. Crew, 944 F.3d 478, 483 (3d Cir. 2019) (where inmate plaintiff "has already had two chances to tell his story . . . giving him further leave to amend would be futile.").

V.   **Conclusion**

The motion (Doc. 52) to dismiss will be granted in part and denied in part. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:        August 16, 2022